**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DIANA S.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 19-cv-6344** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey I. Cummings** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Diana S. ("Claimant") brings a motion to reverse the final decision of the Commissioner

of Social Security (the "Commissioner") denying her claim for Disability Insurance Benefits

("DIBs") and Supplemental Security Income ("SSI"). The Commissioner brings a motion for

summary judgment seeking to uphold the decision to deny benefits. The parties have consented

to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court

has jurisdiction to hear this matter pursuant to 42 U.S.C. §§405(g) and 1383(c)(3). For the

reasons that follow, Claimant's motion to reverse the Commissioner's final decision, (Dckt. #21),

is denied and the Commissioner's motion for summary judgment, (Dckt. #25), is granted.

**I.     BACKGROUND**

**A.     Procedural History**

On September 15, 2015, Claimant (then thirty-two years old) filed an application for SSI

and DIBs, alleging disability dating back to May 27, 2015, when her left leg was amputated

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court refers to Claimant only by her first name and the first initial of her last name. The Court has also substituted Acting Commissioner of Social Security Kilolo Kijakazi as the named defendant, pursuant to Federal Rule of Civil Procedure 25(d).

below the knee due to complications from deep vein thrombosis ("DVT"). (R. 11). Her claim

was denied initially and upon reconsideration. (*Id.*). Claimant filed a timely request for a

hearing, which was held on June 1, 2018, before Administrative Law Judge ("ALJ") Margaret A.

Carey. (R. 37-98). On October 25, 2018, the ALJ issued a written decision finding that

Claimant met listing 1.05(B) from May 26, 2015, through June 1, 2016, the period during which

Claimant recovered from surgery and acclimated to using a prosthetic. (R. 10-27). The ALJ

granted Claimant's application for benefits for this period but found that, as of June 2, 2016,

Claimant's condition had improved to the extent that she was no longer disabled. (R. 12). The

Appeals Council denied review on August 16, 2019, leaving the decision of the ALJ as the final

decision of the Commissioner. (R. 1-6). This action followed.

### B.   The Social Security Administration Standard to Recover Benefits

To qualify for disability benefits, a claimant must demonstrate that she is disabled,

meaning she cannot "engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death, or which

has lasted or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. §423(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or

profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability

claims. 20 C.F.R. §404.1520. The SSA first considers whether the claimant has engaged in

substantial gainful activity during the claimed period of disability. 20 C.F.R.

§404.1520(a)(4)(i). Then, at step two, it determines whether the claimant's physical or mental

impairment is severe and meets the twelve-month durational requirement noted above. 20

C.F.R. §404.1520(a)(4)(ii). At step three, the SSA compares the impairment or combination of

impairments found at step two to a list of impairments identified in the regulations ("the listings").  The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  If the claimant's impairments meet or "medically equal" a listing, she is considered disabled and no further analysis is required.  If a listing is not met, the analysis proceeds.  20 C.F.R. §404.1520(a)(4)(iii).

Before turning to the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), meaning her capacity to work in light of the identified impairments.  Then, at step four, the SSA determines whether the claimant is able to engage in any of her past relevant work.  20 C.F.R. §404.1520(a)(4)(iv).  If the claimant can do so, she is not disabled.  *Id.*  If she cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform given her RFC, age, education, and work experience.  If such jobs exist, the individual is not disabled.  20 C.F.R. §404.1520(a)(4)(v).

If the claimant is found to be disabled at any point in the process, the ALJ must also determine whether her disability continued through the date of the decision.  To find that it did not, the ALJ must show that "medical improvement" has occurred.  Medical improvement is any decrease in medical severity of the impairment(s) as established by improvement in symptoms, signs, or laboratory findings.  20 C.F.R. §§404.1594(b)(1), 416.994(b)(1)(i).

For DIBs claims, SSA regulations prescribe an eight-part test for determining whether medical improvement has occurred.  20 C.F.R. §404.1594.  The SSA must consider: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has an impairment or combination of impairments that meets or equals the severity of an impairment listed in Appendix 1; (3) if not, whether there has been medical improvement; (4) if there has been medical improvement, is it related to claimant's ability to do work (i.e. has it caused an

3

increase in claimant's RFC); (5) if there has not been medical improvement or if the medical improvement is not related to claimant's ability to work, do any exceptions to medical improvement apply; (6) if the medical improvement is related to claimant's ability to do work or if certain exceptions apply, are claimant's current impairments in combination severe; (7) if claimant's impairment is severe, does claimant have the RFC to do past relevant work; and (8) if claimant cannot do past relevant work, does claimant's RFC enable her to do other work. *Id.*

The analysis is the same for SSI claims, except step one is omitted, meaning the performance of substantial gainful activity is not a factor used to determine whether claimant's disability continues. 29 C.F.R. §416.994(b)(5). Accordingly, step one in the SSI medical improvement analysis is the same as step two in the DIBs analysis, and so on.

### C. The Evidence Presented to the ALJ

Claimant seeks disability benefits primarily based on limitations stemming from her amputation, DVT, Graves' disease, lupus, depression, and anxiety. She submitted the following relevant evidence to the Commissioner regarding her claims.

### 1. Medical Records Related to Claimant's Amputation

The nearly 9,600-page record centers primarily on three hospital stays. (R. 17). First, from June 14, 2015, to June 18, 2015, Claimant presented at Roseland Community Hospital with calf tenderness, inflammation, pedal edema, slow capillary refill, and swelling. A CT scan confirmed DVT in the popliteal vein and occlusion of the popliteal artery and Claimant was diagnosed with left lower extremity DVT and protein C deficiency. (R. 9420-21, 9502-03).

From June 18, 2015, to July 2, 2015, Claimant was treated at Mt. Sinai Hospital. There, an angiography revealed complete occlusion to the level of AK popliteal artery left, meaning the blood supply through the artery was blocked. (R. 9238). Although a vascular surgeon was able

4

to partially open the artery, he advised that Claimant required a below the knee amputation because she had developed an acute thyroid storm. (R. 4987). Claimant refused amputation and requested a transfer. (R. 508-09). She was discharged with diagnoses of thrombosis of the left popliteal artery, a compromised left lower extremity, protein C deficiency, thyroid storm, and hypertension. (R. 9374).

Claimant was next admitted to Advocate Christ Hospital from July 2, 2015, to July 20, 2015. There, Claimant underwent a below the knee amputation of her left lower extremity on July 13, 2015. (R. 3819-21). She was discharged with a walker seven days later. (R. 4021). At the time of discharge, she was diagnosed with gangrene, hypercoagulability secondary to protein C deficiency, lupus, a history of DVT and pulmonary embolism, Graves' disease with thyroid storm, phantom limb pain, and anxiety. (*Id.*).

### 2. Medical Records Regarding Claimant's Rehabilitation

Claimant began physical therapy directly following her amputation. She received her first prosthetic on October 19, 2015, but was unable to tolerate it. (R. 2540). Physical therapy notes document trouble with balance and stability and indicate that Claimant was not wearing the prosthetic due to discomfort. By April 14, 2016, however, Claimant reported using her cane and prosthetic more often and had contacted her orthotic specialist to have her prosthetic adjusted. (R. 2722). On June 1, 2016, clinic notes indicate that Claimant was caring for herself, her home, and her three young children, as well as walking on a track and riding her bike for exercise. (R. 682). Claimant was discharged from physical therapy on June 14, 2016. The discharge summary indicated that she had "been non-compliant with therapy." (R. 8745).

On August 4, 2016, Dr. Martin Ellenby, Claimant's treating vascular surgeon, noted that Claimant had the potential to ambulate and that her prognosis was good. (R. 8728). By April

2017, however, Claimant was once again reporting pain due to socket fit problems. (R. 699). On a May 9, 2017, Dr. Ellenby submitted a "Physician Prosthetic Assessment" recommending that Claimant receive a new prosthetic. (R. 715). In the assessment, Dr. Ellenby noted that, due to stump changes since the amputation, Claimant's prosthetic no longer fit and was causing pain, bruising, skin irritation, and misalignment in Claimant's hips. Despite the ill-fitting prosthetic, Dr. Ellenby also observed that Claimant was "able to perform residential walking, prepare meals, complete housework, continue personal hygiene . . . drive . . . perform domestic chores [and] shopping . . . climb stairs and climb ramps . . . [and] exercise." (*Id.*). The assessment also indicated that Claimant had a current and expected functional level of K3, meaning she had "the ability or potential for ambulation . . . typical of the community ambulator who has the ability to traverse most environmental barriers and may have vocational, therapeutic, or exercise activity that demands prosthetic utilization." (R. 716).

Claimant received a new prosthetic on June 29, 2017. (R. 722). In a "Prosthesis Final Delivery Form," a medical care provider noted that the socket fit was "comfortable and supportive," and the new device enabled Claimant to "ambulate without discomfort." (*Id.*).

### 3. Mental Health Records

Claimant was diagnosed with depression and anxiety in 2014. (R. 8731). Since that time, she has been prescribed Xanax and Alprazolam for anxiety, as well as an unnamed serotonin medication for depression. (R. 8733). Although Claimant consistently reported feelings of anxiety and irritability, (R. 4863), providers routinely noted that she showed "no evidence of altered affect, lack of comprehension and disorientation." (R. 5070, 5073, 5077, 5080, 5083, 5086). She was described as alert, oriented, and cooperative, and she displayed appropriate mood and affect. (R. 2359, 2412).

6

Claimant has not received regular mental health counselling. (R. 8733). The most detailed account of her psychological impairments is a mental status report written by state agency consultant Norton Knopf, Ph.D., on October 7, 2016. Claimant appeared alert during the ninety-minute interview with Dr. Knopf, but presented with no apparent emotions, a flat affect, and neutral expressions. (R. 8731). She reported feeling depressed "all the time" and experiencing poor appetite, loss of interest, guilt, sleep disturbance, and fatigue. Claimant also reported feeling anxious all day and experiencing shortness of breath, palpitations, chest pains, dizziness, faintness, excessive sweating, cold hands and feet, constipation, and dry mouth. (R. 8732). No signs of anxiety were observed during the interview. (R. 8731).

Upon examination, Dr. Knopf found that Claimant had logical and coherent thought processes, intact memory, borderline to low average intelligence with no indication of notable decline, fair ability to explain abstractions, a normal fund of information, good insight into her own psychological functioning and adjustment, and good judgment. He also noted that she was cooperative and oriented for person, place, and time. Dr. Knopf diagnosed Claimant with major depressive disorder (recurrent, severe) and generalized anxiety disorder. (R. 8734).

### 4.    Findings of State Agency Consultants

State agency physicians Richard Bilinsky, M.D., and Mila Bacalla, M.D., reviewed Claimant's file on December 16, 2015, and August 31, 2016, respectively. They found that Claimant could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk (with normal breaks) for two hours, sit (with normal breaks) for about six hours in an eight-hour workday, and was limited in her ability to push and pull. (R. 123-24, 157). They further found that Claimant could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds. (R. 124, 158).

State agency psychological consultants Russell Taylor, Ph.D., and Erika Gilyot-Montgomery, Psy.D., reviewed Claimant's file on December 11, 2015, and October 14, 2016, respectively. Relying on Dr. Knopf's findings – which were submitted after Dr. Taylor's 2015 review – Dr. Gilyot-Montgomery concluded that Claimant had no limitations in understanding and memory; moderate limitations in concentration, persistence, and pace; no limitations in social interactions; and moderate limitations in adaptation. (R. 126-27). She indicated that limiting Claimant to simple and detailed tasks with routine breaks and no fast-paced tasks would adequately account for her concentration and persistence limitations, and that limiting Claimant to work with infrequent changes in routine and clear expectations would adequately account for her adaptation limitations. (R. 126-27).

### 5.     Hearing Testimony

Claimant appeared with counsel at the June 1, 2018 hearing before the ALJ. She testified that her stump is black and blue with blisters, (R. 66), and that the swelling and bruising cause such pain that she can stand for only five minutes before needing to sit or lie down for an hour, (R. 60-61). She stated that she can walk across a room, but would need to sit down and rest for two minutes before walking again. (R. 61). Claimant also reported difficulty sitting due to swelling in her leg. (R. 62). The ALJ observed that Claimant walked into the hearing without a cane while carrying a purse and a bag. At one point, Claimant walked to the other end of the hall, used the restroom, and returned to the courtroom within six minutes. (R. 24).

### D.     The ALJ's Decision

The ALJ applied the five-step inquiry required by the Act in reaching her decision to deny Claimant's request for benefits. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since her alleged onset date, despite reporting self-employment

8

income received after her alleged onset date. (R. 16). At step two, the ALJ determined that Claimant suffered from the following severe impairments: asthma, Graves' disease, hypertension, peripheral vascular disease with a history vein thrombosis, amputation six inches below the left knee, depressive disorder, and anxiety disorder. (*Id.*).

At step three, the ALJ concluded that from May 27, 2015, through June 1, 2016, the severity of Claimant's amputation below the left knee met the criteria of listing 1.05(B). Accordingly, Claimant was found to be disabled from May 17, 2015, through June 1, 2016 – the period during which Claimant recovered from surgery and acclimated to using a prosthesis. (R. 19). As of June 2, 2016, however, the ALJ found that Claimant no longer met listing 1.05(B) and that medical improvement had occurred. (R. 21). The ALJ then began the analysis from step one to determine whether Claimant was disabled during the period beginning June 2, 2016.

As of June 2, 2016, the ALJ found that Claimant had the same severe impairments that she had had during the period of disability. (R. 19). However, the ALJ also found that Claimant no longer had an impairment or combination of impairments that met or medically equaled one of the Commissioner's listed impairments, including listing 1.05(B) for amputations, 3.03 for asthma, 4.03 for hypertension, 4.12 for peripheral arterial disease, 9.00 for endocrine disorders, 12.04 for depression, or 12.06 for anxiety. (*Id.*). According to the ALJ, Claimant no longer met listing 1.05(B) because she had returned to effective ambulation with the use of only a cane as of June 1, 2016. (R. 22 (citing R. 682)). When analyzing listings 12.04 and 12.06, the ALJ found that Claimant's mental impairments cause only mild limitations in understanding, remembering, or applying information; no limitation in interacting with others; moderate limitations in concentrating, persisting, or maintaining pace; and mild limitations in adapting and managing herself. (R. 20). The ALJ also considered the "paragraph C" criteria of the mental health listings

9

and found that the evidence did not demonstrate that Claimant is unable to handle changes in her everyday life.  (*Id.*).

Before turning to step four, the ALJ determined that, beginning June 2, 2016, Claimant had the residual functional capacity ("RFC") to perform light work except the following:

> stand two hours; no pushing and pulling with left lower extremity; no ladders, ropes, or scaffolds; occasional ramps/stairs, balancing, stooping, and crouching; no kneeling or crawling; use of a cane for longer distance walking or going over uneven or rough terrain; no unprotected height or operating dangerous machinery; occasional exposure to wetness; occasional exposure to odors, dusts, fumes, gases, and other pulmonary irritants; retains the capacity to understand, remember, concentrate, persist, and perform simple and detailed tasks given routine breaks and lunch in a low stress job, defined as having simple work-related decisions and routine changes in the work setting; and free from a fast-paced environment but able to meet daily quotas.

(R. 21).  Based on these conclusions, the ALJ determined at step four that Claimant was not capable of performing her past relevant work as a hair stylist, mail carrier, childcare attendant, retail salesperson, or cashier.  (R. 24).  Even so, the ALJ concluded at step five that, beginning on June 2, 2016, a sufficient number of jobs existed in the national economy that Claimant could perform given her age, education, work experience, and RFC, including the representative positions of call out operator, document preparer, and addresser.  (R. 25).  As such, the ALJ found that Claimant's disability ended on June 2, 2016, and Claimant had not become disabled again since that date.  (R. 26).

## II.    STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court.  Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). The Commissioner's decision must also be based on the proper legal criteria and be free from legal error. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, making independent symptom evaluations, or otherwise substituting its judgment for that of the Commissioner. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413.

## IV. ANALYSIS

Claimant argues that the Commissioner's decision must be reversed because the ALJ failed to: (1) support her finding that Claimant no longer met listing 1.05(B); (2) support her finding that medical improvement had occurred; (3) properly account for Claimant's physical impairments in the RFC assessment; and (4) properly account for Claimant's mental impairments in the RFC assessment. (Dckt. #21 at 6). The Court disagrees on all counts and will address each of Claimant's arguments in turn.

11

**A.**     **Substantial evidence supports the ALJ's finding that Claimant did not meet listing 1.05(B) after June 1, 2016.**

The listings describe impairments considered "severe enough to prevent an individual from doing any gainful activity, regardless of [her] age, education, or work experience." 20 C.F.R. §§404.1525(a), 416.925(a). They "were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). To match a listed impairment, the claimant bears the burden of showing that her impairment meets "all of the specified medical criteria." *Id.* at 530. "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* When a listing is relevant, the ALJ must: (1) identify the appropriate listing by name, (2) give more than a perfunctory analysis of the issues involved, and (3) consider an expert's opinion on the issue. *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004). A listing discussion is perfunctory when an ALJ "provides nothing more than a superficial analysis" of the listing's criteria. *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004).

As noted above, the ALJ found that Claimant met listing 1.05(B) from May 27, 2015, through June 1, 2016. As of June 2, 2016, however, the ALJ reasoned that Claimant no longer met this listing because the record indicated that she had regained the ability to ambulate effectively. Listing 1.05(B) requires amputation of "[o]ne or both lower extremities at or above the tarsal region, with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively, as defined in 1.00(B)(2)(b), which have lasted or are expected to last for at least 12 months." 20 C.F.R. Pt. 404, Subpt. P., App'x 1, §1.05(B). Under §1.00(B)(2)(b) of Appendix 1, "[i]nability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." This level of impairment "is

12

defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities," such as a walker, two crutches, or two canes. *Id.*

Claimant asserts that the ALJ "did not point to a single shred of evidence that [Claimant] no longer satisfied the criteria of listing 1.05(B)." (Dckt. #21 at 8). This assertion is inaccurate. As Claimant acknowledged elsewhere in her briefs, the ALJ supported her finding that Claimant had regained the ability to ambulate with citations to the medical record, Claimant's activities of daily living ("ADLs"), and the ALJ's personal observations.

In particular, the ALJ primarily relied on the medical record to support her finding that Claimant no longer met listing 1.05(B). Most notably, she relied on a June 1, 2016 physical therapy report in which treating clinician Kathryn Corcoran observed the following:

> **[Claimant] is now walking with just a cane.** She wears her prosthesis every day to help her complete her ADLs, which includes caring for herself, her home, and her [three] young children. She is exercising again to get into better physical condition by walking on a track and riding her bike. Her goals include walking without a cane and eventually running.

(R. 18) (citing R. 682 (emphasis added)). This June 1, 2016 report, which the ALJ repeatedly cited, (*see* R.18, 21, 22), is the basis of the ALJ's finding that Claimant no longer met the criteria of listing 1.05(B) from June 2, 2016, forward. Claimant had to show that she met "all of the specified criteria in order to meet the listing" and the June 1, 2016 finding that she was "now walking with just a cane" shows that she did not meet the listing as of that date. *See Welch v. Saul*, No. 1:19-CV-192-SNLJ, 2021 WL 794769, at *5-6 (E.D.Mo. Mar. 2, 2021) (affirming ALJ's determination that claimant failed to meet listing 1.05(B) where claimant's physicians and the medical records indicated that he could ambulate effectively with his prothesis and a cane, despite the fact that he had some complications with the fit of his prothesis).

The ALJ also cited to the May 9, 2017 finding of Dr. Ellenby, Claimant's treating vascular surgeon, that Claimant had the ability or potential to ambulate with variable cadence and that her prognosis was good. (R. 22) (citing R. 715). The ALJ noted that Claimant received a new prosthetic on June 29, 2017, which enabled her to "ambulate without discomfort." (R. 22) (citing R. 722).[2]

The ALJ further supported her listings finding by referencing Claimant's ADL's. She cited the above-quoted June 1, 2016 physical therapy report by clinician Corcoran, as well as the above-referenced May 9, 2017 report by Dr. Ellenby, which indicated that Claimant could perform residential walking, prepare meals, complete housework, continue personal hygiene, drive, shop, climb stairs, climb ramps, and exercise. (R. 715). Claimant argues that it was inappropriate for the ALJ to rely on these activities because "the ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation." (Dckt. #21 at 9). While this may be correct, the Court notes that caring for three young children, walking around a track, riding a bike, completing household chores, preparing meals, and going shopping are significantly more strenuous than simply walking about one's home.[3] Moreover, the ALJ did not find that these activities in and of themselves proved effective ambulation, but considered them among other factors to determine whether Claimant's symptoms were as severe and limiting as she alleged. This consideration is not only proper but

---

[2] Claimant argues that the latter reports serve only to prove that her "stump pain and problems with her prosthetic device were not limited to the closed period," (Dckt. #21 at 8), but the ALJ never suggested that they were. In fact, she explicitly acknowledged Claimant's reports of ongoing pain beyond June 1, but, critically, found that the discomfort no longer precluded Claimant from ambulation. (R. 22); *see also Welch*, 2021 WL 794769, at *5-6 (claimant's alleged stump complications did not preclude him from ambulating with his prothesis and a cane and, thus, were insufficient to show that he met listing 1.05(B)).

[3] For example, the June 1, 2016 physical therapist's report notes that "Patient is constantly stooping down to pick up kids and keep up with them." (R.687). In addition, this report includes "roller skating" as one of Claimant's "variable cadence activities." (R.682).

14

is encouraged by the regulations. *See Jeske v. Saul*, 955 F.3d 583, 592-93 (7th Cir. 2020) ("[A]n ALJ is not forbidden from considering statements about a claimant's daily life. In fact, agency regulations instruct that, in an assessment of a claimant's symptoms, the evidence considered includes descriptions of daily-living activities.").

Lastly, the ALJ found that Claimant's appearance at the hearing supported a finding that she was able to ambulate effectively. The ALJ noted that Claimant came to the hearing carrying a bag and a purse, walked without a cane, a walker, or a wheelchair, and was not wincing. (R. 23). At one point during the proceedings, Claimant walked to the other end of the hall, used the restroom, and returned to the courtroom in the span of six minutes. (R. 24). Claimant takes issue with the ALJ's reliance on these observations, arguing that they "surely . . . [do] not constitute a qualified medical observation that could undermine not only [Claimant's] testimony but also the medical record." (Dckt. #21 at 8). However, the Seventh Circuit has made clear that ALJs may rely on their observations during administrative hearings when making credibility determinations. *See, e.g., Oakes v. Astrue*, 258 Fed.Appx. 38, 43 (7th Cir. 2007) ("[T]his court has repeatedly endorsed the role of observation in determining credibility.") (citing *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing cases)).[4] Moreover, the bulk of the ALJ's analysis centered on the findings of medical professionals, as outlined above, and the ALJ specifically qualified her personal observations by noting that they were "not dispositive." (R. 24). Given this and prior Seventh Circuit precedent, it was certainly proper for the ALJ to

---

[4] The Court distinguishes the ALJ's observations in this case from the type of situation where an ALJ discredits a claimant's subjective allegations of pain simply because the claimant did not "sit and squirm" during the hearing. *See Flores v. Massanari*, 19 Fed.Appx. 393, 404 (7th Cir. 2001). In this case, the ALJ made observations of Claimant's objective ability to ambulate without a cane and of her ability to ambulate unassisted for a particular distance within a particular time frame.

consider her personal observations of Claimant walking without a cane when assessing Claimant's ability to walk without a cane.

In light of the above, the Court finds that the ALJ's finding that Claimant met listing 1.05(B) as of June 2, 2016, is supported by substantial evidence.

### B. The ALJ properly found that Claimant's medical improvement as of June 2, 2016, was related to her ability to work.

Claimant next argues that, even if the ALJ correctly found that she no longer met listing 1.05(B), the ALJ's "medical improvement" analysis was deficient because she failed to explain how the improvement was related to Claimant's ability to work. (Dckt. #21 at 9). It is true that once an ALJ finds medical improvement, she typically must explain whether the improvement is related to the ability to work. 20 C.F.R. §404.1594. However, as the Commissioner rightly notes, when an ALJ finds disability based on the fact that a claimant's impairment met a listing, and subsequently finds that the claimant no longer meets the same listing, the applicable regulation concludes that medical improvement related to the ability to work has occurred. In particular, the pertinent regulation states:

> If the [listing] level of severity is met or equaled, the individual is deemed, in the absence of evidence to the contrary, to be unable to engage in substantial gainful activity. If there has been medical improvement to the degree that the requirement of the listing section is no longer met or equaled, then the medical improvement is related to your ability to work.

20 C.F.R. §404.1594(b)(3). Here, the ALJ found that Claimant no longer met listing 1.05(B) as of June 2, 2016. This finding was well-supported, as explained above (*see* section IV(A), *infra*), and constitutes a finding that Claimant experienced medical improvement related to her ability to work, per 20 C.F.R. §404.1594(b)(3).

**C.** **Substantial evidence supported the ALJ's RFC findings regarding Claimant's physical limitations.**

The ALJ found that Claimant had the RFC to perform light work with some mental limitations and the following physical limitations:

> [Claimant can only] stand two hours; no pushing and pulling with left lower extremity; no ladders, ropes, or scaffolds; occasional ramps/stairs, balancing, stooping, and crouching; no kneeling or crawling; use of a cane for longer distance walking or going over uneven or rough terrain; no unprotected height or operating dangerous machinery; occasional exposure to wetness; occasional exposure to odors, dusts, fumes, gases, and other pulmonary irritants.

(R. 21). Claimant asserts that this RFC does not account for her physical limitations because the ALJ: (1) failed to adequately support her physical RFC findings; (2) failed to consider impairments stemming from Claimant's Graves' disease and lupus; and (3) improperly relied on Claimant's non-compliance with physical therapy to discount her testimony.[5]

**1.** **The ALJ properly relied on the findings of the state agency physicians to formulate the physical limitations included in Claimant's RFC.**

Claimant first suggests that the ALJ's physical RFC analysis fell short because the ALJ cited no evidence supporting her finding that Claimant could (1) stand for two hours at a time; (2) occasionally climb ramps or stairs, balance, stoop, and crouch; or (3) ambulate without a cane. (Dckt. #21 at 11). As the Commissioner notes, however, these elements of Claimant's RFC mirror with the findings of the state agency physicians – the only medical professionals to

---

[5] Claimant also argues that the ALJ mischaracterized evidence regarding the severity of her DVT. In particular, she suggests that the ALJ wrongly discounted the following note about her amputation site: "wound sutures in place mild drainage noted and redness." (Dckt. #21 at 10). The ALJ observed that this notation appeared verbatim in each Affiliated Oncologist medical report from October 2015 through November 2017, despite the fact that no other contemporaneous source noted that Claimant continued to present with red and draining sutures *more than two years* after her operation. (R. 22). She concluded that the note's continued presence was a clerical error. The Court finds this interpretation to be reasonable given that sutures are removed following the amputation of a leg within weeks (*see, e.g., Mendez-Hechter v. Valentin-Gonzalez*, No. 3:14-CV-01833 (JAF), 2015 WL 9239778, at 1-2 (D.P.R. Dec. 17, 2015) or months (*see, e.g., Carnes v. Kansas City S. Ry. Co.*, 328 S.W.2d 615, 622 (Mo. 1959). Nothing more is required under the applicable standard of review. *See Elder*, 529 F.3d at 413.

make explicit findings regarding Claimant's functional limitations. (R. 158, 168-69). The ALJ relied on these opinions, as she was entitled to. (R. 19, 24); *see Welch,* 2021 WL 794769, at *6. Furthermore, despite Claimant's assertion that the ALJ's conclusion regarding her ability to occasionally stoop or crouch "seems particularly absurd," Claimant presents no medical evidence that she cannot engage in these activities.[6] To the contrary, the oft-cited June 1, 2016 physical therapy report notes that Claimant was "constantly stooping down to pick up kids and keep up with them." (R. 687).

### 2. The ALJ adequately considered the limitations stemming from Claimant's Graves' disease and lupus.

In support of her argument that the RFC does not account for limitations stemming from Graves' disease and lupus, Claimant cites records from November 2014 through October 2015, documenting her complaints of joint pain, nausea, vomiting, fatigue, headaches, dizziness, and itchiness. Claimant argues that, had the ALJ properly considered these symptoms in combination with her other impairments, "it is unlikely she would have found [Claimant] to be capable of a reduced range of light work (or what amounts to a range of sedentary work)." (Dckt. #21 at 10).

The Court first notes that the very records cited by Claimant to evidence these symptoms refute the above inferences because these records explicitly state that she has the capacity to "carry out light or sedentary work (e.g. office work, light house work)," (R. 8761, 8766, 8769),

---

[6] Claimant takes particular issue with the ALJ's finding that she only requires a cane "for longer distance walking or going over uneven or rough terrain." Claimant cites a note by Dr. Ellenby that she would require a cane even with a new prosthetic. (R. 715). However, this note is not necessarily incompatible with the ALJ's finding. Dr. Ellenby did not specify how often or under what circumstances Claimant would require a cane. Furthermore – and contrary to Claimant's assertion – the ALJ cited other evidence to support her finding that Claimant does not require constant use of a cane: her own observations of Claimant walking into and around the courtroom. As discussed in Section IV(A), *supra*, it was permissible for the ALJ to rely on these observations.

18

and to "carry on all pre-disease activities without restrictions," (R. 8764). Furthermore, even if the reports did not include this finding, the ALJ was entitled to discount the portions cited by Claimant as they reflect only the subjective complaints that she made to treating physicians. *See Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir.2008) (ALJs may discount opinions of treating physicians if based on claimant's subjective complaints); *Rice*, 384 F.3d at 371 ("[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints.").

More importantly, Claimant's argument fails because the ALJ *did* consider the limitations stemming from her Graves' disease and lupus. The ALJ acknowledged the headaches caused by Claimant's lupus but noted that her CT scans were normal.[7] The ALJ also observed that Claimant received little follow-up care for lupus and that there was no evidence to suggest that it has more than minimal impacts on her ability to work. (R. 16). As for her Graves' disease, the ALJ cited records that post-date those referenced by Claimant, reflect largely normal physical exams, and show that Claimant's treating physicians declined to recommend aggressive treatments, such as a thyroidectomy. (R. 23). While the ALJ did not explicitly mention each symptom cited by Claimant (such as itchiness or vomiting), this does not render her analysis inadequate. The ALJ was not obligated to address every symptom reported by Claimant throughout the voluminous record – especially when there is no evidence to suggest that the symptoms cause functional limitations. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) ("The ALJ is not required to address every piece of evidence or testimony presented, but must provide a 'logical bridge' between the evidence and his conclusions.").

---

[7] "Lupus headaches," or severe headaches from active lupus that require medication treatment, can be diagnosed with a CT-angiogram. *See* Johns Hopkins Lupus Center, "Nervous System," https://www.hopkinslupus.org/lupus-info/lupus-affects-body/lupus-nervous-system/ (Last visited May 31, 2022).

Claimant also argues that her conservative and non-escalating treatment history was not a valid reason for the ALJ to discount the severity of her Graves' and lupus symptoms. She contends that changes in her treatment – or lack thereof – say little about whether her symptoms remain significant. (Dckt. #21 at 13). As a general matter, however, "an ALJ is entitled to consider the routine and conservative nature of a claimant's treatment in assessing the claimant's credibility." *Annette S. v. Saul*, No. 19 C 6518, 2021 WL 1946342, at *12 (N.D.Ill. May 14, 2021) (citing *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009)); 20 C.F.R. §404.1529(c)(3)(v)). Claimant cites no reason to fault the ALJ for relying on her treatment history aside from her own opinion that it has little probative value. Accordingly, the Court finds that the ALJ did not err by relying on Claimant's conservative treatment when discounting her symptom-related testimony. *See, e.g., Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005); *Vincent A. v. Berryhill*, No. 16 C 7136, 2019 WL 2085104, at *12 (N.D.Ill. May 13, 2019).

### 3. The ALJ's failure to consider whether Claimant had good reason for her non-compliance with physical therapy constitutes harmless error.

Claimant briefly argues that the ALJ improperly considered her non-compliance with physical therapy when discounting her subjective complaints. Claimant argues that the ALJ should have inquired as to why she was non-compliant with therapy and suggests that she may have stopped attending due to her insurance. (Dckt. #21 at 13). Although the document discharging Claimant from therapy did not mention insurance, (R. 8745), when the ALJ asked Claimant why she was no longer in physical therapy, Claimant indicated that it was connected to her insurance. (R. 64).

Inability to afford treatment may be considered a good reason for non-compliance. *See Craft*, 539 F.3d at 679. Accordingly, the ALJ should not have considered Claimant's non-

compliance with therapy as a factor contradicting her subjective complaints without either inquiring further as to the reason for her non-compliance or explaining how her inability to afford ongoing treatment factored into the analysis. *See* SSR 82-59 *2 (S.S.A.), 1982 WL 31384 ("[A]ppropriate development must be made to resolve whether the claimant . . . is justifiably failing to undergo the treatment prescribed.").

Despite this finding, an "administrative error may be harmless" and courts "will not remand a case to the ALJ for further specification where [they] are convinced that the ALJ will reach the same result." *McKinzey*, 641 F.3d at 892. Considering the other legitimate reasons the ALJ relied upon to support her credibility finding in this case, the Court is convinced that she would reach the same result on remand. *Halsell v. Astrue*, 357 Fed.Appx. 717, 722-23 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as enough of them are."); *Tina L. v. Kijakazi,* No. 3:20-CV-50327, 2022 WL 80245, at *5 (N.D.Ill. Jan. 7, 2022) (same); *Annette S,* 2021 WL 1946342, at *10 (same). Accordingly, the ALJ's incomplete analysis of Claimant's noncompliance with treatment constitutes harmless error. *See, e.g., Matthews v. Saul*, 833 Fed.Appx. 432, 437 n.3 (7th Cir. 2020) (finding harmless error when the ALJ drew a negative inference from a claimant's failure to seek additional medical treatment without first considering explanations for the failure); *Kittelson v. Astrue*, 362 Fed.Appx. 553, 558 (7th Cir. 2010) (same).

### D. Substantial evidence supported the ALJ's RFC findings regarding Claimant's mental limitations.

To account for Claimant's non-physical impairments, the ALJ found that she "retains the capacity to understand, remember, concentrate, persist, and perform simple and detailed tasks given routine breaks and lunch in a low stress job, defined as having simple work-related decisions and routine changes in the work setting; and free from a fast-paced environment but able to meet daily quotas." (R. 21). Claimant argues that this RFC does not adequately account

21

for her mental limitations for three reasons. First, she again asserts that the ALJ inappropriately relied on "conservative treatment" to discount her symptoms. She also argues that the ALJ failed to support her findings regarding Claimant's "paragraph B" limitations and inappropriately "glossed over" the findings of the consultative examiner. Again, the Court disagrees.

Claimant is prescribed Xanax and Alprazolam for anxiety, as well as an unnamed medication for depression. (R. 8733). To Claimant's point, the Court agrees that a primary care doctor prescribing medications does not necessarily constitute "conservative" treatment for a mental illness. *See, Nordlund v. Colvin*, No. 14-cv-480-jdp, 2015 WL 6509382, at *2 (W.D.Wis. Oct. 28, 2015) ("[T]he mere fact that Nordlund treated her mental impairments with medication does not, without further explanation, necessarily undermine Nordlund's credibility."); *Chubb v. Colvin*, No. 3:12-cv-168-JD, 2013 WL 4540726, at *11 (N.D.Ind. Aug. 27, 2013) ("Where mental activity is involved, administering medications that can alter behavior shows anything but conservative treatment.") (internal quotations omitted). Here, however, the ALJ contextualized her finding that Claimant's treatment was conservative by comparing it to other treatment options – such as counseling, medication management via a psychiatrist, intensive outpatient treatment, and psychiatric hospitalization. (R. 23). The guidelines specifically encourage discussions regarding the frequency and extent of treatment sought when evaluating a claimant's subjective complaints, *see*, SSR 16-3p, 2017 WL 5180304, *9, and other courts have not found classifying treatment with psychotropic medications as "conservative" to be problematic. *See, e.g, Sandra P. v. Kijakazi*, No. 20 C 1771, 2022 WL 488742, at *4 (N.D.Ill. Feb. 17, 2022); *Shaun R. v. Saul*, No. 18 C 4036, 2019 WL 6834664, at *8 (N.D.Ill. Dec. 16, 2019) (affirming ALJ's reference to conservative treatment of mental illness as "a reason to disbelieve plaintiff was suffering the crippling symptoms he claimed he was").

22

Even if characterizing Claimant's mental health treatment as conservative was an error, it would not require reversal. The ALJ's credibility findings receive special deference and will only be overturned if patently wrong. *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017). "[P]atently wrong . . . means that the decision lacks *any* explanation or support." *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (emphasis added) (citation omitted). Here, the ALJ's analysis of Claimant's subjective complaints regarding her mental impairments was supported by the findings of state agency psychiatrists as well as references to treatment notes from various physicians. (R. 23).

Claimant next faults the ALJ for failing to support her "paragraph B findings" with citations to the record. This argument is unsuccessful where the ALJ's paragraph B findings are supported by the findings of the state agency psychologist. (R. 121). The ALJ found that Claimant's mental impairments cause only mild limitations in understanding, remembering, or applying information; no limitation in interacting with others; moderate limitations in concentrating, persisting, or maintaining pace; and mild limitations in adapting and managing herself. (R. 20). The ALJ also elaborated on her paragraph B findings in her RFC analysis, as she was entitled to do. (R. 20). *See Curvin v.* Colvin, 778 F.3d 645, 650 (7th Cir. 2015) ("To require the ALJ to repeat such a discussion throughout his decision would be redundant.").

Finally, the Court finds that the ALJ's analysis of a report by consultative examiner Dr. Knopf was accurate and thorough. Claimant's allegation that the ALJ "glossed over" Dr. Knopf's findings is hard to understand given that the ALJ explicitly referred to the same portions of the report that are highlighted by Claimant. For example, the ALJ noted that Dr. Knopf diagnosed Claimant with major depressive disorder (recurrent, severe) and generalized anxiety disorder; that Claimant presented with a flat affect and a depressed and anxious mood during the

exam; and that Claimant endorsed symptoms of poor appetite, loss of usual interests, guilt, motor retardation, sleep disturbance, fatigue, and loss of interest in sex. (R. 23) (citing R. 8731). The ALJ also cited additional findings by Dr. Knopf that were not acknowledged by Claimant: that Claimant demonstrated good insight, good judgment, intact memory, stable intellectual ability, borderline to average intelligence, an adequate fund of information and calculation skills, and no evidence of thought process disorder or psychosis. (R. 23).

No portion of Dr. Knopf's report contradicts the ALJ's RFC assessment. He did not make any findings regarding Claimant's functional capacity and his diagnoses of depression and anxiety do not, on their own, suggest that any greater limitations were necessary. *See Perez v. Astrue*, 881 F.Supp.2d 916, 945 (N.D.Ill. 2012) (noting that diagnoses do "not automatically translate to a limitation or impairment"). Claimant herself fails to suggest any additional limitations that she feels would better address her mental impairments. Without evidence from a medical source that a certain impairment will limit the Claimant's functional capacity (or even allegations from Claimant to this effect), the Court will not fault the ALJ for "failing to create limitations of [her] own." *Lemerande v. Berryhill*, No. 17-C-190, 2018 WL 1061462, at *7 (E.D.Wis. Feb. 26, 2018).

## CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgment, (Dckt. #21), is denied and the Commissioner's motion for summary judgment, (Dckt. #25), is granted.

**ENTERED:  June 28, 2022**

**Jeffrey I. Cummings**
**United States Magistrate Judge**

24